UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 25-CR-80015-MIDDLEBROOKS/MATTHEWMAN

Case No. _____

**18 U.S.C. § 1349**
**18 U.S.C. § 1343**
**18 U.S.C. § 371**
**18 U.S.C. § 1957(a)**
**18 U.S.C. § 2**
**18 U.S.C. § 982(a)(1), (a)(7)**

**UNITED STATES OF AMERICA**

**vs.**

**CORY LLOYD and**
**STEVEN STRONG,**

      **Defendants.**

_____/

FILED BY _____ **BM** _____ D.C.

*Feb 11, 2025*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Patient Protection and Affordable Care Act ("ACA") and ACA Plans

1.    In 2010, Congress enacted the ACA in part to expand Americans' access to affordable health insurance. The ACA sought to accomplish this, in part, through federal subsidies that reduced the cost of health insurance for eligible consumers.

2.    The ACA established a premium tax credit, also known as a "subsidy," which was a refundable tax credit designed to assist eligible individuals and families in affording health insurance purchased through an "Exchange." An Exchange was an entity that made Qualified

Health Plans ("QHPs") available to qualified individuals. QHPs offered over an Exchange are referred to herein as "ACA Plans." In Florida, the Exchange used the HealthCare.gov platform, which was operated by the Centers for Medicare and Medicaid Services ("CMS"). Private insurers offered ACA Plans through the Exchange.

3.     To be eligible for a subsidized ACA Plan in Florida, an individual's projected household income for the coverage year generally was required to be greater than 100% and less than 400% of the federal poverty line. In 2021 and extended through 2025, COVID-19-related legislation temporarily eliminated the income cap for subsidies making subsidies available for some consumers whose income exceeded 400% of the federal poverty line. Individuals with projected incomes below the federal poverty line did not qualify for a federal subsidy.

4.     The amount of the subsidy available to an eligible consumer was based on a sliding scale; consumers with lower qualifying incomes received a larger subsidy, while consumers with higher qualifying incomes received a smaller subsidy.

5.     The Internal Revenue Service ("IRS") issued a publication stating that, to be eligible for a subsidy, a consumer must have a household income of at least 100% of the federal poverty line for the relevant family size, among other requirements. The IRS publication clarifies that, "[f]or individuals with household income below 100% of the federal poverty line," consumers may be eligible for an exception allowing the subsidy. "However, the exception . . . does not apply if, with intentional or reckless disregard for the facts, you provide incorrect information to the Marketplace for the year of coverage. You provide information with intentional disregard for the facts if you know that the information provided is inaccurate. You provide information with a reckless disregard for the facts if you make little or no effort to determine whether the information

2

provided is accurate and your lack of effort to provide accurate information is substantially different from what a reasonable person would do under the circumstances." IRS Pub. 974 (2019).

6.      Consumers who were eligible for a subsidy could elect to receive it in advance, or they could claim it as a lump sum tax credit when they filed a tax return. If a consumer elected advanced payments of the subsidy, this was known as an advance premium tax credit ("APTC").

7.      CMS and IRS established annual Agreed Upon Procedures governing the process through which CMS authorized the payment of subsidies, including APTCs. Once authorized, the APTC was transmitted directly to the insurer offering the ACA Plan in the form of a payment toward the applicable monthly premium. These federal subsidies were funded through an indefinite refund appropriation administered by the IRS.

8.      Consumers who elected to receive subsidy payments in advance in the form of an APTC were required to reconcile the amount advanced with the actual subsidy for which the consumer was determined to be eligible when a tax return was filed for the applicable year. As a result, in some circumstances, a consumer could be responsible for paying back some of the subsidy. This repayment obligation could arise if the consumer's income, family size, or other circumstances changed during the year.

### Medicaid

9.      The Florida Medicaid program ("Medicaid") provided benefits to certain low-income individuals. Subsidized ACA Plans were not available to individuals who were eligible for Medicaid.

10.     The Florida Department of Children and Families ("DCF") Automated Community Connection to Economic Self Sufficiency ("ACCESS") system maintained an online portal called MyACCESS that allowed Floridians to access their public assistance information, including

3

Medicaid information. Consumers could apply for Medicaid through MyACCESS and receive any notices about their application.

11.     Before determining whether a consumer who had applied for an ACA Plan was eligible, the Exchange determined whether they were eligible for Medicaid or Children's Health Insurance Program ("CHIP").  In the event a consumer was found to be eligible for Medicaid or CHIP, the Exchange transferred the account to DCF.  If a consumer reported an income at or above the federal poverty line, they generally were not eligible for Medicaid or CHIP absent other specific eligibility criteria such as disability or pregnancy.

### Open Enrollment and Special Enrollment Periods

12.     Consumers were permitted to enroll in ACA Plans during the annual open enrollment period. Open enrollment occurred during a set period each year, typically between November 1 of the calendar year preceding the benefit year through January 15 of the benefit year.

13.     A consumer was permitted to enroll in an ACA Plan outside of open enrollment if the consumer qualified for a special enrollment period ("SEP") triggered by certain qualifying life events ("QLEs"). SEPs generally lasted for 60 days following a QLE.

14.     QLEs included change in primary place of living, loss of health insurance, change in household size, and change in eligibility for ACA Plan coverage, among others.

15.     In some circumstances, applying for and being denied Medicaid was a QLE. Specifically, consumers could apply for an ACA Plan during a SEP if they had applied for Medicaid during open enrollment or due to a QLE, and were determined either after open enrollment or more than 60 days after the QLE to be ineligible for Medicaid.

16.     During the COVID-19 pandemic, CMS created an additional SEP that allowed consumers in states with Exchanges served by the HealthCare.gov platform to enroll in ACA Plans for benefit year 2021. This SEP was available from February 15, 2021, through August 15, 2021.

4

17.     Beginning on or about March 18, 2022, an additional SEP was made available to consumers who were eligible for APTCs, who had an estimated annual household income at or below 150% of the federal poverty level in their state, and who were not eligible for Medicaid. This SEP was extended through at least 2025. This SEP did not change the requirements to receive a subsidy.

**ACA Plan Application Process**

18.     Consumers could apply for ACA Plans online through HealthCare.gov. Consumers could apply directly by entering personal information into the online application, or they could provide their information to an intermediary that applied on their behalf. Individuals or their representatives were required to provide information on their applications demonstrating eligibility for federal subsidies for an ACA Plan.

19.     ACA Plan applications on HealthCare.gov included an electronic signature that required consumers to agree to the following attestation: "I'm signing this application under penalty of perjury, which means I've provided true answers to all of the questions to the best of my knowledge. I know I may be subject to penalties under the federal law if I intentionally provide false information."

20.     After initially determining that a consumer was eligible for an ACA Plan and determining the amount of any subsidy, the Exchange and CMS often sought to verify and supplement information provided by the consumer.  When doing so, the Exchange and CMS provided written notices explaining what information was requested. For example, the Exchange often sought to verify annual income estimates, incarceration status, citizenship status, and other information.

21.     Consumers were allowed at least 90 days from the date of their eligibility notice to provide any additional information requested by the Exchange and CMS. If the consumer missed

5

the deadline, the Exchange made a new determination of the ACA Plan and subsidy amount for which the consumer qualified. This new determination could result in a consumer receiving a lower subsidy or losing the subsidy altogether. If a consumer lost the subsidy or received a lower subsidy, the consumer typically could remain enrolled in the ACA Plan but would be financially responsible for a higher monthly premium payment on that ACA Plan.

### The Defendants, Related Entities, and Relevant Persons

22.     From in or around August 1988, through in or around February 2021, Company 1 was an insurance brokerage company. In or around February 2021, Company 2 acquired the assets of Company 1. Company 1 and Company 2 marketed and sold various types of insurance, including ACA Plans, throughout Florida and in other states.

23.     Lloyds of Lauderdale, LLC ("Lloyds of Lauderdale") was a company formed under the laws of Florida with its principal place of business in Martin County, Florida.

24.     Defendant **CORY LLOYD**, a resident of Martin County, Florida, was a part-owner of Company 1 until its acquisition by Company 2. From in or around August 2018 through in or around November 2022, **LLOYD** also served as Company 1's Chief Operating Officer and, after Company 2 acquired Company 1, as President. **LLOYD** was listed as manager of Lloyds of Lauderdale and the sole signatory on an account ending in x0825 in the name of Lloyds of Lauderdale at Bank 1 (the "Lloyds of Lauderdale Account").

25.     Individual 1, a resident of Martin County, Florida, was an Executive Vice President and a compliance officer at Company 1 and Company 2.

26.     Strong Opportunities, LLC d/b/a FloridaCare Insurance ("Florida Care") was a company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida. Florida Care marketed ACA Plans to consumers in Florida and in other states.

6

27.     Arizona Financial Partners Inc. d/b/a Know Your Neighbors ("Arizona Financial Partners") was a company incorporated under the laws of Arizona with its principal place of business in Maricopa County, Arizona.

28.     Defendant **STEVEN STRONG**, a resident of Tarrant County, Texas, was the president and owner of Florida Care, and the Chief Executive Officer and an owner of Arizona Financial Partners. **STRONG** was the sole signatory on an account ending x1869 in the name of Florida Care at Bank 3 (the "Florida Care Account").

29.     Insurer 1 was a company incorporated under the laws of Florida. Insurer 1 provided health insurance plans throughout Florida, including federally subsidized ACA Plans. Insurer 1 paid commissions to Company 1 and Company 2 for enrolling consumers in ACA Plans issued by Insurer 1.

30.     Yacht Broker 1 was a company formed under the laws of Florida with its principal place of business in Broward County, Florida. Yacht Broker 1 brokered the sale of yachts and other vessels.

31.     Construction Company 1 was a limited liability company formed under the laws of Florida with its principal place of business in Martin County, Florida. Construction Company 1 was a general contractor that performed, among other tasks, home renovations.

## COUNT 1
### Conspiracy to Commit Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

7

2.      From in or around August 2018, and continuing through in or around September 2022, in Martin, Broward, Miami-Dade, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**CORY LLOYD and
STEVEN STRONG,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, Individual 1, and others known and unknown to the Grand Jury, to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) deceptively marketing subsidized ACA Plans to consumers who were homeless, unemployed, and had no income, including paying bribes to induce consumers to agree to enroll in such plans; (b) falsely inflating consumer income projections on ACA Plan applications in order to make the consumer appear qualified for a subsidized ACA Plan and, in turn, maximize enrollments and commission payments from Insurer 1 to Company 1 and Company 2; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for subsidized ACA Plans on behalf of

8

consumers who did not qualify for such subsidies; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.     **CORY LLOYD** caused Company 1 to enter into contracts with Insurer 1 to receive commission payments and other payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

5.     **CORY LLOYD** caused Company 1 to hire **STEVEN STRONG** and Florida Care to solicit consumers to enroll in subsidized ACA Plans, including by engaging in "street marketing" whereby marketers working for Florida Care targeted vulnerable, low-income persons and persons experiencing homelessness, unemployment, and mental health and substance abuse disorders, at homeless shelters, bus stops, clinics, and similar locations.

6.     **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators enrolled and caused the enrollment of consumers in subsidized ACA Plans knowing that Florida Care marketers working on their behalf had offered bribes in the form of cash, gift cards, food, and alcohol to induce such consumers to agree to enroll; coached consumers on how to respond to application questions to maximize the subsidy amount; and provided addresses and social security numbers that did not match the consumer purportedly applying.

7.     **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators enrolled and caused the enrollment of consumers in subsidized ACA Plans knowing that the consumers did not qualify for a subsidized ACA Plan because they did not make, and had no legitimate expectation of making, the minimum income required to receive a subsidy for an ACA

Plan. **LLOYD, STRONG**, Individual 1, and other co-conspirators enrolled these consumers in ACA Plans by submitting applications through interstate wire transmissions.

8.      **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators used, and caused other Company 1 and Company 2 employees to use, misleading call scripts and other deceptive sales techniques to convince consumers to state that they would attempt to make the minimum income necessary to qualify for a subsidized ACA Plan, even when the consumer initially projected zero income.

9.      **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators caused Company 1 and Company 2 employees to falsely represent that consumers had experienced a "loss of coverage" or other "life change" in response to the Exchange and CMS's requests for verification of income and other information for successfully-enrolled consumers, in order to extend deadlines for responding to verification requests, make consumers appear eligible for subsidies, and enable Company 1 and Company 2 to continue to receive commissions from Insurer 1.

10.     **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators submitted and caused the submission of Medicaid applications through MyACCESS on behalf of consumers that were designed to cause Medicaid to automatically deny the application, regardless of whether the consumer in fact qualified for Medicaid. **LLOYD, STRONG**, Individual 1, and others then used these Medicaid denials to trigger an SEP and circumvent the restrictions of open enrollment.

11.     **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators submitted and caused the submission of applications for subsidized ACA Plans on behalf of consumers who were not eligible for such subsidies, including consumers who were enrolled in

10

other health care plans and programs, such as Medicaid or local assistance programs. As a result, some of these consumers experienced disruptions in their medical care, including disruptions in the treatment of mental health and substance abuse disorders.

12.     From in or around September 2018, through in or around September 2022, **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and others submitted and caused the submission of false and fraudulent enrollments in ACA Plans, causing CMS and the IRS to pay at least $161,900,000 in subsidies.

13.     From in or around August 2018, through in or around September 2022, Insurer 1 paid Company 1 and Company 2 millions of dollars in commission payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

14.     From in or around August 2018, through in or around September 2022, Company 1 and Company 2 paid **STEVEN STRONG**, Arizona Financial Partners, and Florida Care approximately $6,516,457.15 in commission payments in exchange for referring consumers to enroll in ACA Plans.

15.     **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and other co-conspirators used the proceeds of the fraud to benefit Company 1 and Company 2, themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

<u>**COUNTS 2-4**</u>
**Wire Fraud**
**(18 U.S.C. § 1343)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

11

2.      From in or around August 2018, and continuing through in or around September 2022, in Martin, Broward, Miami-Dade, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**CORY LLOYD and
STEVEN STRONG,**

did knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) deceptively marketing subsidized ACA Plans to consumers who were homeless, unemployed, and had no income, including paying bribes to induce consumers to agree to enroll in such plans; (b) falsely inflating consumer income projections on ACA Plan applications in order to make the consumer appear qualified for a subsidized ACA Plan and, in turn, maximize enrollments and commission payments from Insurer 1 to Company 1 and Company 2; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for subsidized ACA Plans on behalf of consumers who did not qualify for such subsidies; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### The Scheme and Artifice

4.    The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Use of Wires

5.    On or about the dates set forth as to each count below, in Martin, Broward, Miami-Dade, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**CORY LLOYD and
STEVEN STRONG,**

did knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, and for the purpose executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as described below:

| Count | Approx. Date of Submission | Description of Wire |
|:-----:|:-----:|---|
| 2 | September 23, 2020 | Electronic transmission from Company 1, from within Florida, to CMS, through servers outside of Florida, of an ACA Plan Application in the name of E.H. |
| 3 | April 8, 2021 | Electronic transmission from Company 1, from within Florida, to CMS, through servers outside of Florida, of an ACA Plan Application in the name of P.B. |
| 4 | May 26, 2021 | Electronic transmission from Company 1, from within Florida, to CMS, through servers outside of Florida, of an ACA Plan Application in the name of M.B. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 5
### Conspiracy to Defraud the United States
### (18 U.S.C. § 371)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around August 2018, and continuing through in or around September 2022, in Martin, Broward, Miami-Dade, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**CORY LLOYD and
STEVEN STRONG,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, Individual 1, and others known and unknown to the Grand Jury to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of CMS and IRS in their administration and oversight of the ACA and APTCs.

### *Purpose of the Conspiracy*

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to impair, impede, and obstruct CMS's ability to administer the program, and unlawfully enrich themselves, by, among other things: (a) deceptively marketing subsidized ACA Plans to consumers who were homeless, unemployed, and had no income, including paying bribes to induce consumers to agree to enroll in such plans; (b) falsely inflating consumer income projections on ACA Plan applications in order to make the consumer appear qualified for a subsidized ACA Plan and, in turn, maximize enrollments and commission payments from Insurer 1 to Company 1 and Company 2; (c) concealing the submission of false and fraudulent applications for subsidized ACA Plans, including by interfering with the Exchange's and CMS's attempts to verify statements about

14

income contained on ACA Plan applications submitted by Company 1 and Company 2; (d) interfering with the Exchange's and CMS's ability to administer designated SEP periods; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the Manner and Means of the conspiracy.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about September 23, 2020, **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and others submitted, and caused the submission of, an ACA Plan application in the name of E.H. seeking a fully-subsidized ACA Plan with Insurer 1.

2.      On or about April 8, 2021, **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and others submitted, and caused the submission of, an ACA Plan application in the name of P.B. seeking a fully-subsidized ACA Plan with Insurer 1.

3.      On or about May 26, 2021, **CORY LLOYD**, **STEVEN STRONG**, Individual 1, and others submitted, and caused the submission of, an ACA Plan application in the name of M.B. seeking a fully-subsidized ACA Plan with Insurer 1.

4.      On or about December 9, 2021, **CORY LLOYD** emailed a Company 1 employee a list of consumers enrolled in subsidized ACA plans by Company 1 that were subject to losing their subsidies.

5.      On or about January 12, 2022, **CORY LLOYD** texted Individual 1 to inform him that a new special enrollment period would not be available until March 2022, and, until then, to use a special enrollment period related to COVID-19 to enroll consumers outside of open enrollment or, "if that doesn't fit, Medicaid."

6.      On or about May 1, 2022, **CORY LLOYD**, on behalf of Company 1, and **STEVEN STRONG**, on behalf of Florida Care, entered into a renewed Marketing and Advertising Agreement that provided, in part, that Company 1 would pay Florida Care commissions and other payments in exchange for Florida Care referring consumers to Company 1 for potential enrollment in health insurance plans, including ACA Plans.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 6-7
### Money Laundering
### (18 U.S.C. § 1957(a))

1.      Paragraphs 1 through 24 and 29 through 31 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth as to each count below, in Martin County, in the Southern District of Florida, and elsewhere, the defendant, **CORY LLOYD**, did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, and knowing that the property involved in the monetary transaction was derived from some form of unlawful activity as more particularly described in each count below:

| Count | Approx. Date of Transaction | Description of Monetary Transaction |
|---|---|---|
| 6 | May 11, 2020 | Wire transfer of approximately $140,000 from the Lloyds of Lauderdale Account to an account ending in x7426 held in the name of Yacht Broker 1 at Bank 2 |
| 7 | August 17, 2020 | Wire transfer of approximately $97,197 from the Lloyds of Lauderdale Account to Construction Company 1 |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

## COUNTS 8-9
### Money Laundering
### (18 U.S.C. § 1957(a))

1.       Paragraphs 1 through 22 and 26 through 29 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.       On or about the dates set forth as to each count below, in Martin County, in the Southern District of Florida, and elsewhere, the defendant, **STEVEN STRONG**, did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, and knowing that the property involved in the monetary transaction was derived from some form of unlawful activity as more particularly described in each count below:

| Count | Approx. Date of Transaction | Description of Monetary Transaction |
|---|---|---|
| 8 | June 10, 2020 | Wire transfer of approximately $24,015 from the Florida Care Account to an account ending x3864 held in the name of Strong Brothers Transport & Housing, LLC |
| 9 | July 15, 2021 | Wire transfer of approximately $500,000 from the Florida Care Account to an account ending x9069 held in the name of Strong Family Real Estate and Housing LLC |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendants, **CORY LLOYD** and **STEVEN STRONG**, have an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 1349, or Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United Stats Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

3.      Upon conviction of a "federal health care offense," as defined by Title 18, United States Code, Section 24, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United Stats Code, Section 982(a)(7), property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense.

4.      Upon conviction of a violation of Title 18, United States Code, Section 1957(a), as alleged in this Indictment, the defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such violation, and any property traceable to such property.

5.      The property, which is subject to criminal forfeiture includes, but is not limited to, the following:

18

(a)     One (1) 2004 Lazzara FBMY (HIN: LYC80065A404) and bearing the name

"Always Barefoot," to include all Equipment and Inventory.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by

Title 28, United States Code, Section 2461(c), Title 18, United States Code, Sections 982(a)(1)

and (a)(7), and the procedures set forth at Title 21, United States Code, Section 853.

A TRUE BILL

███████████████████████

FOREPERSON

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMIE DE BOER
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

D. KEITH CLOUSER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.: 25-CR-80015-MIDDLEBROOKS/MATTHEWMAN**

v.

CORY LLOYD and
STEVEN STRONG,

**CERTIFICATE OF TRIAL ATTORNEY**

_____/
　　　　　　　　　Defendants.

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami　　☐ Key West　　☐ FTP
☐ FTL　　　☑ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No____
   List language and/or dialect: _____

4. This case will take 15____ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)
   I　☐　0 to　5 days
   II　☐　6 to 10 days
   III　☑　11 to 20 days
   IV　☐　21 to 60 days
   V　☐　61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No____
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No____
   If yes, Judge _____ Magistrate Case No._____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes__
   If yes, Judge Robin L. Rosenberg_____ Case No. 24-CR-80154_____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No____

13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No____

15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No____

16. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No____

17. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No____

By: _____
　　KEITH CLOUSER
　　DOJ Trial Attorney
　　SDFL Court ID No.　A5502882

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: _____ **CORY LLOYD** _____

**Case No**: _____

Count #:   1

  Title 18, United States Code, Section 1349 _____

  Conspiracy to Commit Wire Fraud _____
**\* Max. Term of Imprisonment:     20 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:     3 years**
**\* Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

  Title 18, United States Code, Section 1343 _____

  Wire Fraud _____
**\* Max. Term of Imprisonment:     20 years as to each count**
**\* Mandatory Min. Term of Imprisonment (if applicable):     N/A**
**\* Max. Supervised Release:    3 years**
**\* Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

Count #:   5

  Title 18, United States Code, Section 371 _____

  Conspiracy to Defraud the United States _____
**\* Max. Term of Imprisonment:     5 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):     N/A**
**\* Max. Supervised Release:     3 years**
**\* Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: _____ **CORY LLOYD** _____

**Case No**: _____

Counts #:   6 – 7

  Title 18, United States Code, Section 1957(a) _____

  Money Laundering _____
**\* Max. Term of Imprisonment:     10 years as to each count**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:    3 years**
**\* Max. Fine:   $500,000 or twice the value of the property involved in the transaction.**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: _____ **STEVEN STRONG** _____

**Case No**: _____

Count #:   1

  Title 18, United States Code, Section 1349 _____

  Conspiracy to Commit Wire Fraud _____
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

  Title 18, United States Code, Section 1343 _____

  Wire Fraud _____
* **Max. Term of Imprisonment:    20 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   5

  Title 18, United States Code, Section 371 _____

  Conspiracy to Defraud the United States _____
* **Max. Term of Imprisonment:    5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____ **STEVEN STRONG** _____ _____

**Case No:** _____

**Counts #:**   8 – 9

  Title 18, United States Code, Section 1957(a) _____ ____ ___ _____ _____ _

  Money Laundering _____
\* **Max. Term of Imprisonment:**    **10 years as to each count**
\* **Mandatory Min. Term of Imprisonment (if applicable):**   **N/A**
\* **Max. Supervised Release:**    **3 years**
\* **Max. Fine:**    **$500,000 or twice the value of the property involved in the transaction.**

_____

_____

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**